# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-SA-01024-COA

**LISA LANGLEY**                                                     **APPELLANT**

**v.**

**MISSISSIPPI STATE BOARD OF EDUCATION**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/21/2022 |
| TRIAL JUDGE: | HON. TIFFANY PIAZZA GROVE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | LISA LANGLEY (PRO SE) |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KIMBERLY PINE TURNER DAVID CHRISTOPHER MINTON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 08/01/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     In the spring of 2021, Lisa Langley was terminated from her position as a special education teacher for the Hinds County School District (HCSD) based on violations of certain standards of conduct adopted by the Mississippi State Board of Education (Board). Her termination as a teacher, based upon these violations, constituted grounds for the suspension or revocation of her teaching license pursuant to Mississippi Code Annotated section 37-3-2(13)(a) (Supp. 2020). Following a hearing before a subcommittee of the Commission on Teacher and Administrator Education, Certification and Licensure and Development (Commission), the Commission suspended Langley's educator license for five

years and imposed other conditions that Langley was required to meet prior to reinstatement of her license.

¶2. Langley appealed the Commission's decision to the Board. The Board upheld the Commission's decision. Langley appealed the Board's order to the Hinds County Chancery Court. The chancery court affirmed the Board's order upholding the Commission's decision.

¶3. Langley appeals, asserting that (1) the Commission's findings that she violated the confidentiality standard of conduct (Standard 9) and that she took HCSD property were not supported by substantial evidence; (2) her termination by HCSD was improper because she was not placed on a teacher improvement plan; and (3) her constitutional rights were violated because she did not receive an unbiased, fair hearing. We disagree. For the reasons discussed below, we affirm the chancery court's final judgment affirming the Commission's decision, as upheld by the Board.

**PROCEDURAL HISTORY AND STATEMENT OF FACTS**

¶4. Langley is a Mississippi licensed teacher with approximately fifteen years of experience in public school education. She was employed by HCSD as a special education (SPED) teacher in both the 2019-2020 and 2020-2021 school years. While she was working for HCSD, Langley was the subject of a number of HCSD inquiries and was required to meet numerous times with school administrators regarding her interactions with colleagues, her willingness or ability to follow HCSD policies, her relationship with students and parents, her maintenance of student records, and her overall job performance.

¶5.     In a letter dated March 30, 2021, HCSD notified Langley that her 2020-2021 contract

was terminated due to alleged violations of the Mississippi Educator Code of Ethics,

Standards of Conduct (Standards), namely Standards 1 (Professional Conduct),[1] 2

(Trustworthiness),[2] 3 (Unlawful Acts), 4 (Educator/Student Relationships),[3] 8 (Remunerative

Conduct),[4] and 9 (Maintenance of Confidentiality).[5] The letter specified each Standard that

was violated and set forth in detail the particular violations with respect to these Standards

and the steps taken by HCSD to discuss these issues with Langley. The letter also informed

---

[1] **Standard 1: Professional Conduct** provides that "[a]n educator should demonstrate conduct that follows generally recognized professional standards" and itemizes examples of "ethical" conduct, including encouraging colleagues, participating in teacher development, maintaining competence regarding skills and knowledge, and maintaining a professional relationship with parents of students. Standard 1 also provides examples of "unethical" conduct, including harassment of colleagues.

[2] **Standard 2: Trustworthiness** provides that "[a]n educator should exemplify honesty and integrity in the course of professional practice" and sets forth examples of ethical and unethical conduct in this category.

[3] **Standard 4: Educator/Student Relationships** provides that "[a]n educator should always maintain a professional relationship with all students, both in and outside of the classroom" and sets forth examples of ethical and unethical conduct in this category.

[4] **Standard 8: Remunerative Conduct** provides that "[a]n educator should maintain integrity with students, colleagues, parents, patrons, or businesses when accepting gifts, gratuities, favors, and additional compensation." Specifically listed as an example of unethical conduct is "[t]utoring students assigned to the educator for remuneration unless approved by the local school board."

[5] **Standard 9: Maintenance of Confidentiality** provides that "[a]n educator shall comply with state and federal laws and local school board policies relating to confidentiality of student and personnel records, standardized test material, and other information covered by confidentiality agreements."

Langley that she was entitled to a hearing and provided the steps she was required to take to secure that hearing.[6] Langley requested a hearing on her termination and was notified, in writing, of the date, time, and place of her termination hearing, which was scheduled for April 26-27, 2021.

¶6. Following a hearing before a hearing officer, the Hinds County School Board adopted the findings of the hearing officer affirming Langley's dismissal. Mississippi Code Annotated section 37-9-59 (Rev. 2019) provides that following such decision, any licensed educator "shall be allowed an appeal to the chancery court," but Langley did not seek judicial review of the Hinds County School Board's final decision. Langley subsequently was employed by a different Mississippi school outside of HCSD.

¶7. Pursuant to Mississippi Code Annotated section 37-3-2, HCSD reported to the Mississippi Department of Education's Office of Educator Misconduct (OEM) that Langley had been terminated for violating Standards 1, 2, 3, 4, 8, and 9 and provided supporting documentation.

¶8. Following a review of HCSB's report, the OEM filed a sworn complaint about Langley with the Commission. The complaint alleged that Langley's termination based on violations of Standards 1, 2, 8, and 9 constituted grounds for suspension or revocation of her

---

[6] See Miss. Code Ann. § 37-9-59 (providing that any licensed educator who has been "dismiss[ed] or suspend[ed] . . . shall be notified of the charges against him and he shall be advised that he is entitled to a public hearing upon said charges").

4

educator license.[7] Langley received a copy of the sworn complaint and a copy of the Rules for Procedure for Disciplinary Hearings by the Commission, 7 Miss. Admin. Code Pt. 3, R. 14.6.3 (adopted Feb. 22, 2021) (Commission Procedural Rules). Langley also received notice of the date, time, and location for a hearing scheduled for October 14, 2021, all in accordance with Commission Procedural Rule 14.6.3. Langley requested a continuance that was granted, and the hearing before the Commission was then scheduled for October 28. The OEM furnished Langley with a witness list and a copy of the exhibits that it intended to produce at the hearing on its behalf.

¶9. On October 28, 2021, the Commission held a hearing on the complaint against Langley.[8] The OEM presented the testimony of three witnesses and offered twenty-nine exhibits that were entered into evidence, consisting of over 300 pages of emails, correspondence, reports, plans, and attendance logs concerning the grounds for Langley's termination. Langley represented herself at the hearing. She cross-examined the OEM's witnesses, voiced objections, and testified on her own behalf. She presented no other

---

[7] *See* Miss. Code Ann. § 37-3-2(13)(a) ("Dismissal or suspension of a licensed employee by a local school board pursuant to Section 37-9-59 may result in the suspension or revocation of a license for a length of time which shall be determined by the commission and based upon the severity of the offense.").

[8] *See* Miss. Code Ann. § 37-3-2(10) ("All controversies involving the . . . revocation, suspension or any change whatsoever in the licensure of an educator required to hold a license shall be initially heard in a hearing de novo, by the commission or by a subcommittee established by the commission and composed of commission members . . . ."). Langley's hearing was before a "subcommittee established by the commission and composed of commission members," as allowed by section 37-3-2(10).

witnesses.

¶10.    Dr. Delesicia Martin, superintendent for HCSD, testified before the Commission.  As superintendent, she is responsible for the day-to-day operations of the district and supervision of all directors, assistant superintendents, and principals.   She is also responsible for reporting violations of the Standards to the OEM.  With respect to Langley, Dr. Martin testified that HCSD hired her in the fall of 2019.  HCSD contracted with Langley to teach for the 2019-2020 and the 2020-2021 school years.  HCSD did not renew her contract for the 2021-2022 school year, and HCSD ultimately terminated Langley's contract on March 30, 2021.  Dr. Martin testified that HCSD had issues with Langley from her hire date through her termination from the district.  HCSD began documenting the issues beginning in late spring of 2020 while all students and teachers were in virtual classrooms due to COVID-19, as reflected in exhibit OEM-4.

¶11.    HCSD contacted Langley at the end of the 2019-2020 school year and requested she complete all outstanding tasks relating to the school year, specifically outstanding Individualized Education Programs (IEPs) for her students.  IEPs show the strengths and deficits of a student, delineate a teaching plan, and also disclose any health or behavioral issues.  As Dr. Martin testified and as reflected in exhibit OEM-4, HCSD requested Langley to come into the central office to receive assistance in completing the outstanding tasks, but Langley failed to report as directed.  HCSD placed Langley on a professional enrichment performance plan (documented as exhibit OEM-6 as a "professional improvement plan") on

6

September 14, 2020, after having met with Langley on August 31, 2020. At the meeting, and then in the plan, HCSD detailed the work expected from Langley. As reflected in several OEM exhibits, HCSD issued an official write-up on February 5, 2021, and Carver Middle School (where Langley worked) issued a formal reprimand on February 8, 2021.

¶12.    Dr. Martin also testified that a parent claimed Langley created an email address for her (the parent), and, according to the parent, Langley did so "in order to help the parent get their child into the Mississippi School for the Deaf." Several emails were sent from that address, but the parent said she was not sending the emails. Although Dr. Martin was told by the SPED director that the parent had produced the emails, Dr. Martin had not seen them. Dr. Martin and other administrators met with Langley about this matter, and Dr. Martin testified that at that meeting, she requested Langley to turn over her computer "because [Dr. Martin] wanted to investigate, along with our technology director, the actual computer to determine if the email address had been used." Langley was placed on administrative leave with pay pending an investigation.[9]

¶13.    Dr. Martin testified that HCSD was unable to investigate this allegation because Langley refused to return her HCSD-issued laptop computer. In particular, after meeting with Langley about the purported email account and "phantom" emails issue, Dr. Martin asked Langley to leave her HCSD-issued MacBook computer and keys with the assistant

---

[9] We note that during Langley's testimony, a Commission member asked her if she sent "phantom" emails on a parent's behalf. Langley responded, "No, Ma'am I did not. I'm not that good in technology."

principal at Carver Middle School. Langley did not do so. Instead, Langley left the school campus with both the keys and the MacBook computer. Dr. Martin testified that campus video footage showed Langley "running to her car" with the MacBook after being requested to turn it over at the school. Langley did not deny that these actions were reflected in that video. Dr. Martin terminated the contract between HCSD and Langley on March 30, 2021, based on violations of Standards, 1, 2, 3, 4, 8, and 9.

¶14. Dr. Martin also testified about other emails and communications among the school principal and other teachers concerning interactions between Langley and coworkers. These communications were entered into evidence as exhibits OEM-5 and OEM-25. For example, Langley frequently emailed other teachers during instructional/classroom time despite repeated requests that she not do so because that time should be devoted to the students. Langley also attempted to teach or train new employees even though school leadership had specifically asked her not to do so because she was already on an improvement plan. School leadership told Langley on numerous occasions to direct all questions from new employees to the Exceptional Services Department or other appropriate individuals for further instruction.

¶15. Dr. Martin also testified about Langley's unwillingness to implement the changes HCSD adopted in IEP reporting, unwillingness to take on new tasks when assigned, and failure to meet other required performance goals addressed in Langley's professional enrichment (improvement) plan.

¶16. Additionally, Dr. Martin testified about a complaint that Langley was tutoring an HCSD student for profit without Board approval, which is in direct violation of district policy. The school principal and Nicole Duncan Langham, an "Exceptional Services" case manager who also testified at the hearing, received a complaint from a teacher showing Langley submitting assignments on behalf of a student, along with assignments that were not in the student's own handwriting. Langley told Dr. Martin that she submitted the assignments at the request of the student, but Langley did not admit or deny tutoring the student, or whether she completed the assignment on behalf of the student.

¶17. Further, Dr. Martin testified about Langley using student email addresses to communicate with persons outside the school community about non-school-related activities. Exhibits OEM-9, 18, 23, and 24 document this activity and Langley's response to questioning relating to this activity. When Dr. Martin questioned Langley about those emails, Dr. Martin testified that Langley said the emails from certain students were hacked, but HCSD's investigation into the allegedly hacked emails did not show any evidence of hacking. The investigation showed Langley's school-issued MacBook accessing students' email addresses to send emails about non-school related activities. HCSD issued a letter of reprimand regarding the improper use of a student's district email account on March 25, 2021.

¶18. The record also shows the numerous efforts HCSD made to work with Langley so she could continue her employment with the district, as demonstrated by Dr. Martin's testimony

and in the improvement plan and documentation showing subsequent meetings about Langley's progress on the plan. Exhibit OEM-26 was a timeline setting forth the numerous meetings and steps taken to assist Langley in performing her duties.

¶19. As noted, Langham also testified at the Commission hearing. She is one of two Exceptional Services case managers for HCSD. She testified that her general duties include direct support for teachers and to serve as a middleman between SPED teachers and the SPED director. She monitors compliance and IEPs and attends meetings with teachers, among other duties. Langham said Langley was assigned to her as one of her SPED teachers in the 2020-2021 school year.

¶20. Langham testified about the duties and responsibilities of a SPED teacher under her management, which include developing IEPs for SPED students, implementing IEPs to include services noted on a per student basis (individual plans for each student), maintaining records, seeing that deadlines imposed by district, state, and federal regulations are met, collaborating with other teachers on education plans for students, maintaining confidentiality, and working with parents/guardians along with the student to ensure the student's needs are met and services provided appropriately.

¶21. Specifically regarding Langley, Langham testified about several professional issues she had with her, including Langley's failure to properly complete her students' IEPs by the end of the year and the timeline set by the HCSD in the 2019-2020 school year; Langley's failure to report to the central office for scheduled work hours for assistance in completing

10

the IEPs; and Langley's failure to provide adequate services and proper documentation for virtual learning in this same school year.

¶22. Additionally, Langham testified that because of the unplanned switch to virtual learning in March 2020, she provided many virtual professional development classes to instruct her SPED teachers how best to teach virtually and implement the changes in reporting software. HCSD documentation shows that Langley failed to attend the training. Langham testified that it was clear that Langley did not watch any of the training videos provided because Langley failed to follow instructions on accessing records in the software and entering information. These tasks were both explained in great detail in the training videos.

¶23. Langham also testified that in August 2020 (during the 2020-2021 school year), several parents complained about the previous year's IEPs written by Langley. Langley told the parents that the students would advance grades despite not meeting the criteria to do so. Langley failed to note several health and behavior issues on certain students' IEPs. Langham testified that Langley was placed on an improvement plan, but Langley failed to make any changes and was not receptive to the criticism.

¶24. In response to the complaints, Langham said that she performed audits on several of Langley's IEPs. Langham noted numerous corrections and suggestions to the audited IEPs on printed copies, but Langley failed to make any corrections in the IEP reporting software ("SEAS"). Langham testified she did not audit all of Langley's IEPs, but she did audit

11

several and noted errors on each. Langham further testified that it is her practice to annually audit two percent of all teachers' IEPs, and she offers suggestions and feedback to all teachers. She testified that Langley was the only teacher who failed to make any corrections.

¶25. Tilla Tate, a licensed investigator for the OEM, testified that she provided Langley with notice of the complaint and all exhibits, along with the date and time of the hearing. Tate also testified that she provided Langley with a copy of the Commission Procedural Rules governing the proceedings, and Langley called and spoke with her on several occasions concerning the procedures for the Commission hearing. Tate explained to her that she would need to submit evidence at least seven days before the hearing, along with a witness list, if she wanted to submit evidence or call witnesses to testify in her behalf. Tate explained to Langley that the OEM would not subpoena witnesses on Langley's behalf. Tate noted that Langley failed to submit any documents to the OEM as evidence in accordance with the Commission Procedural Rules.

¶26. Langley testified on her own behalf, stating that at the time of the hearing, it was her fifteenth year in SPED. She returned to HCSD in the 2019-2020 school year to work at Terry High School, and HCSD transferred her to Carver Middle School and then to Main Street RESTART (alternative school). She signed a contract renewal for the 2020-2021 school year.

¶27. Langley testified that the pandemic occurred in the 2019-2020 school year, and both the teachers and students did not return to the traditional classroom after spring break.

12

According to Langley, HCSD did not have a plan in place when everyone went home, but Langley said that HCSD directed SPED teachers to document how students were served virtually. She stated the SPED director and principal checked her out at the end of the year.

¶28. As to the 2020-2021 school year, Langley testified that the teachers and students returned to the classroom in August 2020, and her school had several new SPED teachers. She said that when they asked questions, she helped them. She testified the teachers worked together to figure out where an individual student had problem areas. Langley testified she made sure all her students received services.

¶29. Regarding professional development and meeting attendance, Langley testified that during the 2019-2020 school year, it was not uncommon to have multiple virtual classes and meetings occurring simultaneously. She stated at one point she had three laptops with three different virtual classes or meetings happening at the same time. When asked about the meetings, she stated the meetings could be virtual classes, virtual faculty meetings, or virtual IEP meetings.

¶30. With respect to her termination meeting with the superintendent (Dr. Martin), Langley admitted to leaving school property with the district-issued MacBook computer and classroom keys after specifically being asked to return both to the school principal. When she returned to the school where she worked, she admitted that her employee badge had been deactivated, but instead of leaving the requested items with the assistant principal, she left. While not acknowledging several requests for the items, she admitted to stating she would

13

only return the keys and MacBook computer once she got her personal belongings from her classroom.

¶31. During her testimony, Langley did not address the emails showing communications between herself and school faculty. Her only testimony regarding Standard 1 (Professional Conduct) was that it was "hitting [her] hard" saying she was harassing people at school. Regarding Standard 2 (Trustworthiness), Langley said she only discussed students with allowed parties, meaning the student, parent/guardian, case manager, general education teachers of students, and administrators as schools. Langley did not address whether her behavior exemplified honesty and integrity in the course of professional practice.

¶32. Regarding Standard 8 (Remunerative Conduct), Langley said that teachers were not paid enough and likened tutoring students to selling t-shirts and pencils at school "because you don't have time for another job." She said she never received anything from a student other than "Christmas gifts," which the school allowed. She did not address submitting a student's homework as alleged, nor did she address exhibit OEM-24, which consisted of documentation about these submissions. Langley denied having a tutoring business.

¶33. Regarding Standard 9 (Maintenance of Confidentiality), Langley said she did not violate any testing standards; however, the alleged violation was not regarding testing standards, rather it concerned violating the Maintenance of Confidentiality as required by federal and state law and local district policy. Langley did not address this issue. On cross-examination, Langley was asked, "Do you keep school records off campus?" Langley

14

originally said "no" and that the records were kept in her classroom, but she eventually admitted to taking records home during the pandemic. Langley did not admit to keeping records at her home after the pandemic ended, but she did allude to having records at home in the 2020-2021 school year. Langley did admit that she accessed student records in SEAS after being terminated from HCSD, in direct contravention of HCSD policy and both federal and state law. She testified that she did so because "I have to have evidence in case somebody fires me."

¶34. Upon completion of the hearing, the Commission entered its detailed order that delineated the facts set forth above and its ruling. The Commission observed that Langley's "demeanor and behavior . . . at the hearing . . . causes great concern to the Commission about [Langley's] mental health and fitness to perform the duties required under an educator license." In particular, the Commission "found [Langley's] behavior to be erratic, deflective, and dismissive of the complaint against her. When question[ed] about the actions taken by HCSD, [Langley] displayed behavior indicating 'everyone' was against her by fabricating evidence and testimony, but she failed to present any evidence or testimony that proved otherwise." The Commission also observed that Langley "deflected questions and often refused to answer direct questions." On the other hand, the Commission "found the evidence and testimony of the HCSD employees to be convincing."

¶35. After considering all the evidence presented, the Commission found that Langley had violated Standards 1, 2, 8, and 9 and "ha[d] not displayed evidence of good character or

15

emotional health by engaging in these actions and behaviors with students, parents, and colleagues [and, further, that she] . . . mishandled IEPs and school property, both in direct violation of HCSD policy and state and federal law." The Commission suspended Langley's Mississippi educator's license for a five-year period and required that she attend at least two courses, one addressing teacher ethics and professionalism and a second course on special education law, and submit to a mental-health evaluation from a licensed professional to evaluate her fitness to perform her duties under her educator's license.

¶36. Langley appealed the Commission's decision to the Board.[10] After hearing oral argument and considering and reviewing the complete record of the Commission proceedings, the Board upheld the Commission's decision, finding that it was supported by substantial evidence, was not arbitrary and capricious, was within the authority of the Commission, and did not violate Langley's statutory or constitutional rights.[11]

¶37. Langley appealed the Board's April 21, 2022 order to the Hinds County Chancery

---

[10] *See* Miss. Code Ann. § 37-3-2(10) (providing that a decision of the Commission is final unless the aggrieved party appeals to the Board within ten days of the Commission's decision and further providing that an appeal to the Board "shall be on the record previously made before the commission").

[11] *See* Miss. Code Ann. § 37-3-2(10) (providing that on appeal of a commission decision to the State Board of Education, "[t]he decision of the commission, its subcommittee or hearing officer shall not be disturbed on appeal if supported by substantial evidence, was not arbitrary or capricious, within the authority of the commission, and did not violate some statutory or constitutional right").

Court.[12] The chancery court heard oral arguments. Langley appeared pro se, and the Board was represented by counsel. After considering the arguments of the parties, the administrative record, and the applicable law, the chancery court affirmed the Commission's decision, as upheld by the Board.

¶38. Recognizing its limited scope of review of an administrative decision, the chancery court found that substantial evidence supported the decision, finding that it "was premised upon the testimony of Dr. Martin, Ms. Langham, Langley herself[,] and volumes of documentation supporting the same." Although the chancery court agreed with Langley that the Commission lacked substantial evidence supporting "allegations of a fake email account," the chancery court then specifically observed that with respect to other allegations, "Langley herself admitted that she refused to return a [d]istrict issued laptop upon request and that she accessed and copied confidential student records for her own purposes." Based on all the evidence before the Commission as contained in the certified record, the chancery court "specifically [found] the testimony and evidence presented sufficient to meet the definition of substantial evidence."

¶39. The chancery court also rejected Langley's assertion that her constitutional rights had been violated. On this point, the chancery court found that "the record is clear that Langley

---

[12] *See* Miss. Code Ann. § 37-3-2(16) (providing that an aggrieved party may appeal the Board's decision by filing a notice of appeal with the Chancery Court of the First Judicial District of Hinds County, Mississippi "within thirty . . . days after notification of the action of the board is mailed or served," and the appeal shall be "on the record made, including a verbatim transcript of the testimony at the hearing").

17

was provided due process, with ample notice and opportunity to be heard." In particular, "Langley received a formal written Complaint and Notice of Hearing, as well as the grant of a requested continuance. She was provided with a written copy of the applicable rules of procedure." Under these circumstances, the chancery court found that it "cannot find that the due process rights of Langley were violated. Instead, this Court finds that she had notice, as well as a full and impartial hearing."

¶40. Langley appealed.

## STANDARD OF REVIEW AND ANALYSIS

¶41. "Judicial review of an administrative decision is limited." *McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d 145, 151 (¶20) (Miss. 1999). As the Supreme Court has explained, "[o]n appeal of the decision of an administrative agency, all levels of review focus on the final decision of the agency." *Miss. State Bd. of Contractors v. Hobbs Constr. LLC*, 291 So. 3d 762, 768 (¶12) (Miss. 2020). As such, "this Court applies the same standard of review to the Board's decision as that applied by the chancellor." *Id.* at 769 (¶12). In this regard, "the Court reviews the decision of an administrative agency to determine whether the decision was supported by substantial evidence, was arbitrary or capricious, was beyond the agency's power to adopt, or was violative of a constitutional or statutory provision." *Id.* (quoting *Mem'l Hosp. at Gulfport v. Dzielak*, 250 So. 3d 397, 400 (¶11) (Miss. 2018)). "[T]here is a rebuttable presumption in favor of the action of an administrative agency and the burden of proof is upon one challenging its action." *McFadden*, 735 So. 2d at 151 (¶22).

18

Further, "[b]ecause the administrative agency sits as finder of fact, a reviewing court is obligated to show 'substantial deference' to any determination of credibility or trustworthiness of witness testimony." *Buckhaults v. Pub. Emps.' Ret. Sys. of Miss.*, 296 So. 3d 727, 731 (¶9) (Miss. Ct. App. 2019) (quoting *Pub. Emps.' Ret. Sys. v. Cobb*, 839 So. 2d 605, 609 (¶12) (Miss. Ct. App. 2003)).

**I.    Whether the Commission's decision, as upheld by the Board and affirmed by the chancery court, was supported by substantial evidence and was not arbitrary or capricious.**

¶42.    Langley asserts that the Commission's decision is unsupported by substantial evidence because the Commission relied upon hearsay and "indirect evidence" in determining that she had violated the Standards and suspending her license on that basis. In particular, Langley asserts that two particular incidents are unsupported by substantial evidence—her refusal to turn over the HCSD-issued laptop computer and her violation of Standard 9 (Maintenance of Confidentiality). From this, Langley asserts that the chancery court erred in affirming the Commission's decision as upheld by the Board. We find this assertion is without merit for the reasons addressed below.

¶43.    The supreme court has defined "[s]ubstantial evidence . . . as such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Knight v. Pub. Emps.' Ret. Sys.*, 108 So. 3d 912, 915 (¶13) (Miss. 2012) (internal quotation marks omitted). "Further, substantial evidence has been described 'as that which provides an adequate basis of fact from which the fact in issue can be reasonably inferred.'" *Pub. Emps.' Ret. Sys. v.*

19

*Howard*, 905 So. 2d 1279, 1285 (¶16) (Miss. 2005) (quoting *Pub. Emps.' Ret. Sys. v. Dishmon*, 797 So. 2d 888, 892 (¶13) (Miss. 2001)).

¶44. In contrast, a "decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone." *Id.* And a decision is capricious if made "without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." *Id.*

¶45. Based on our review of the record and in accordance with our deferential standard of review of the Commission's decision that is applicable here, we find substantial evidence supports the Commission's decision to suspend Langley's license based upon multiple violations of Standards 1 (Professional Conduct), 2 (Trustworthiness), 8 (Remunerative Conduct) and 9 (Maintenance of Confidentiality).

¶46. Langley asserts that the Commission's decision was not supported by substantial evidence because some of the evidence it heard was hearsay. We find Langley's assertion unconvincing because Langley ignores that under Mississippi law and the Commission Procedural Rules, the Commission is not bound by formal rules of evidence and may generally consider the evidence it believes relevant to the proceedings, including hearsay, so long as that evidence is corroborated. *See McClinton v. Miss. Dep't of Emp. Sec.*, 949 So. 2d 805, 808 (¶6) (Miss. Ct. App. 2006) (citing *Davis v. Pub. Emps.' Ret. Sys.*, 750 So. 2d 1225, 1231 (¶17) (Miss. 1999)). Commission Procedural Rule 14.6.3(10) provides:

> In conducting a hearing, the Commission . . . shall not be bound by common law or by statutory rules of evidence or by technical or formal rules of

procedure, except those provided herein, but may conduct such hearing in such manner as to best ascertain the rights of the parties; provided, however, hearsay evidence, if admitted, shall not be the sole basis for the determination of facts by the Commission.

¶47. In this case, to the extent hearsay evidence was admitted, the record clearly reflects that the OEM presented ample direct, corroborating evidence supporting Langley's misconduct warranting suspension of her educator license for five years. As detailed above, the Commission heard, considered, and relied upon testimony from Dr. Martin and Langham who both testified not only to documented occurrences of misconduct by Langley, but also as to their first-hand, personal knowledge of events. Specifically, based upon her personal knowledge, Dr. Martin testified about instances of Langley's direct insubordination, failure to abide by HCSD policy, failure to attend mandated meetings, and other actions considered Standard violations, including Langley's refusal to return the HCSD-issued laptop computer as directed or cooperate in the investigation regarding Langley's creation of an email account on a parent's behalf.

¶48. Likewise, Langham testified about her personal knowledge of Langley's failure to timely and properly complete student records, particularly student IEPs, as well as Langley's failure to report to scheduled work hours for assistance in completing the IEPs, or attend meetings and trainings, particularly training relating to teaching virtual classes and implementing the changes in the reporting software. Further, the record contains 29 exhibits entered into evidence consisting of hundreds of pages of emails, correspondence, reports, plans, and attendance logs supporting the grounds for Langley's termination.

¶49. Langley specifically asserts that the Commission lacked substantial evidence supporting her refusal to turn over the HCSD-issued laptop computer and her violation of Standard 9 (Maintenance of Confidentiality), but Langley's own admissions and testimony at the Commission hearing support these violations. Langley testified that she accessed and copied student records for her own benefit both prior to and following her termination by HCSD and she admitted to refusing to turn in the HCSD-issued laptop computer when Dr. Martin requested her to do so, testifying that she intended to keep the computer until her personal belongings were returned to her. Nor did Langley deny the events documented in the campus video described by Dr. Martin showing Langley "running to her car" with the HCSD-issued laptop after being requested to turn it over at the school.

¶50. Further, as discussed in detail below, because HCSD's decision to terminate Langley was a final decision, the Commission was authorized pursuant to section 37-3-2(13)(a) to suspend her educator license "for a length of time which shall be determined by the commission and based upon the severity of the offense." Miss. Code Ann. § 37-3-2(13)(a). Even if there had not been direct proof of every allegation against Langley, we find that the testimony and evidence presented at the Commission hearing constitute ample substantial evidence supporting the Commission's decision as a whole, as upheld by the Board and affirmed by the chancery court. We further specifically find that nothing in the Commission's detailed, thorough order indicates that the Commission acted in an arbitrary or capricious manner.

22

**II.      Whether the Commission was authorized to suspend Langley's educator license.**

¶51.    Langley asserts that her termination from the HCSD was improper because she was not placed on a teacher improvement plan prior to her dismissal. Langley appears to assert that because of her purportedly improper termination, the Commission was without authority to suspend her educator license. We find Langley's assertion unpersuasive. As an initial matter, HCSD dismissed Langley from her employment pursuant to section 37-9-59.[13] Although Langley *could have* appealed to the chancery court the Hinds County School Board's decision upholding her termination,[14] she did not do so. That decision, therefore, is final and not subject to attack. *See A & F Props. LLC v. Madison Cnty. Bd. of Sup'rs*, 933 So. 2d 296, 302 (¶14) (Miss. 2006) ("Under Mississippi law, res judicata or collateral estoppel precludes relitigation of administrative decisions." (quoting *Smith v. Univ. of Miss.*, 797 So. 2d 956, 963 (¶22) (Miss. 2001))).

¶52.    In any event, Langley's argument is not supported by Mississippi law or the record. Although Mississippi Code Annotated section 37-18-7 (Rev. 2019) refers to the development of a "professional development plan" for "teachers . . . who are identified . . . as needing improvement," this statute applies only to designated "Schools at Risk." There is no

---

[13] Mississippi Code Annotated section 37-9-59 provides that "[f]or incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil or other good cause the superintendent of schools may dismiss or suspend any licensed employee in any school district," and sets forth the procedures for doing so.

[14] *See* Miss. Code Ann. § 37-9-59 (providing that any person dismissed or suspended by a school district has the right to appeal that decision to the chancery court).

23

evidence in the record that the schools employing Langley were designated as "Schools at Risk."

¶53.    More importantly, the Commission had before it numerous exhibits evidencing that Langley had been put on a professional development plan or improvement plan, and Dr. Martin addressed this in her testimony before the Commission.  As such, there is no legal or evidentiary basis supporting Langley's assertion that the Commission was without authority to suspend her license because she was improperly terminated by HCSD.  Specifically, upon the "[d]ismissal . . . of a licensed employee by a local school board pursuant to Section 37-9-59," as in this case, section 37-3-2(13)(a) confers authority on the Commission to "suspen[d] or revo[ke] . . . a license for a length of time which shall be determined by the commission and based upon the severity of the offense."  That final decision is grounds for suspension of her educator license as authorized by section 37-3-2(13)(a).

### III.    Whether Langley was afforded due process at her hearing before the Commission.

¶54.    Langley asserts that her constitutional rights were violated because she was not provided an "unbiased fair hearing."  This is so, she asserts, because the HCSD, OEM, Board, and the Attorney General's Office "[were] all on the same side against a teacher." We find that Langley's lack-of-due-process assertion is without merit.

¶55.    Under Mississippi law, "[i]n order to satisfy due process in agency proceedings, 'agency actions must provide minimum procedural due process, which requires (1) notice and (2) an opportunity to be heard.'"  *Richards v. Miss. Dep't of Pub. Safety*, 318 So. 3d 1150,

24

1162 (¶59) (Miss. Ct. App. 2020) (quoting *Ray v. Miss. Dep't of Pub. Safety*, 172 So. 3d 182, 190 (¶31) (Miss. 2015)). In this case, the OEM investigator Tate testified at the Commission hearing that she provided Langley with notice of the complaint and all exhibits, along with the date and time of the hearing. She also provided Langley with a copy of the Commission Procedural Rules governing the proceedings. Langley was also provided with the OEM's witness list and the exhibits that the OEM intended to produce at the hearing and have entered into evidence. Additionally, Ms. Tate testified that Langley called and spoke with her on several occasions concerning the procedures for the Commission hearing. Further, combined exhibit OEM-1 that was entered into evidence at the hearing contains the correspondence to Langley explaining her charges and the hearing set for her to answer the charges against her. This exhibit also shows that a copy of the sworn complaint and Commission Procedural Rules, as well as the OEM's witness and exhibit lists, were sent to Langley by certified mail. Langley also requested and received a continuance.

¶56. We also observe that Langley represented herself at the Commission hearing and the transcript of that hearing shows that Langley cross-examined the OEM's witnesses at length, voiced objections, and testified on her own behalf. Although she was informed of her right to present other witnesses, and that it was her responsibility to do so, Langley did not present any other witnesses.

¶57. In short, we find that Langley was plainly provided notice and an opportunity to be heard. We find that Langley's lack-of-due-process assertion has no support in the record or

25

under Mississippi law.

¶58. Langley also asserts that her constitutional or statutory rights were violated because the OEM "kept taking down [her] license during all of her appeals." Langley cites no authority for this proposition, and thus this issue is waived on appeal. *See, e.g., Green v. Green*, 349 So. 3d 1187, 1200 (¶47) (Miss. Ct. App. 2022) ("Our caselaw clearly provides that the failure to cite supporting legal authority precludes consideration of an issue on appeal."); M.R.A.P. 28(a)(7) (requiring that the argument portion of the appellant's brief "shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on").

¶59. Even if Langley had properly addressed this issue on appeal, we find no support for Langley's assertion. There is no indication in the record that Langley sought a stay pending appeal during her appeal process, nor does section 37-3-2(16) contain any provision for a stay as to a decision of the Board regarding "denying an application, revoking or suspending a license or otherwise disciplining" a licensee while an appeal is pending. On the contrary, section 37-3-2(15) provides that "[t]he revocation or suspension of a license shall be effected at the time indicated on the notice of suspension or revocation," Miss. Code Ann. § 37-3-2(15), and the Commission's order clearly provided that Langley's five-year suspension was to take effect from the date of the October 28, 2021 hearing. We find that this additional constitutional due process contention is without merit.

26

¶60.   **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**